Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:08 PM CDT

Asia R. Mann, now known as Asia R. Harrison,
appellant and cross-appellee, v. Brian L.
Mann, appellee and cross-appellant.

___ N.W.3d ___

Filed June 21, 2024.    No. S-23-608.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.
2. **Modification of Decree: Attorney Fees: Appeal and Error.** In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.
3. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
4. **Statutes: Appeal and Error.** Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.
5. **Child Custody: Jurisdiction: Appeal and Error.** The question whether jurisdiction should be exercised under the Uniform Child Custody Jurisdiction and Enforcement Act is entrusted to the discretion of the trial court and is reviewed by an appellate court de novo on the record for abuse of discretion.
6. ____: ____: ____. In considering whether jurisdiction exists under the Uniform Child Custody Jurisdiction and Enforcement Act, a jurisdictional question that does not involve a factual dispute is determined by

an appellate court as a matter of law, which requires an appellate court to reach a conclusion independent from the trial court.

7. **Modification of Decree: Child Custody: Proof.** The party seeking modification of a dissolution decree has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification.

8. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

9. **Modification of Decree: Child Custody: Proof.** Modifying a custody or parenting time order requires two steps of proof. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests.

10. **Modification of Decree: Words and Phrases.** Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently.

11. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

12. **Child Support: Appeal and Error.** Whether a child support order should be retroactive is entrusted to the discretion of the trial court, and an appellate court will affirm its decision absent an abuse of discretion.

13. **Modification of Decree: Child Support: Time.** Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification.

14. **Attorney Fees.** Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

15. ____. Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

16. **Jurisdiction.** Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject

matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties.

Appeal from the District Court for Douglas County, J Russell Derr, Judge. Affirmed.

Kathryn D. Putnam, of Astley Putnam, P.C., L.L.O., for appellant.

Aaron F. Smeall, of Smith, Pauley, Slusky & Rogers, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

## I. INTRODUCTION

In this appeal concerning modifications to a stipulated dissolution decree, the ex-wife challenges the denial of her request for sole legal and physical custody of the couple's two children. The ex-wife primarily argues that the ex-husband's conviction for stalking her demonstrates domestic intimate partner abuse under the Parenting Act[1] and that, as such, the district court had to take specific actions to protect her and the children. The ex-wife also challenges the modification of child support and other matters. On cross-appeal, the ex-husband argues that the district court erred in finding that it lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)[2] over the ex-wife's child from a prior relationship and in vacating the portion of the decree that found he stood in loco parentis to such child. Finding no merit to the parties' arguments, we affirm.

---

[1] Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2022).

[2] Neb. Rev. Stat. §§ 43-1226 to 43-1266 (Reissue 2016 & Cum. Supp. 2022).

## II. BACKGROUND

### 1. Factual Background

Asia R. Mann, now known as Asia R. Harrison, and Brian L. Mann married in 2011. When they married, Harrison had a daughter, Maleah D., who was the subject of a judgment by a California court establishing paternity. The California court also granted Harrison sole legal and physical custody of Maleah and granted visitation to Maleah's biological father. After their marriage, Harrison and Mann had a daughter in 2012 and a son in 2013. For purposes of this opinion, Harrison's and Mann's son and daughter are referred to collectively as "the children."

In 2016, Harrison filed for dissolution in the district court for Douglas County, Nebraska. While the dissolution was pending, Maleah's biological father registered the California paternity judgment in the Nebraska district court. However, the parties failed to bring that judgment to the dissolution court's attention until after the stipulated decree was entered.

The district court initially entered a stipulated decree dissolving the parties' marriage on June 20, 2018. However, that decree was vacated after the parties informed the court that the draft decree and parenting plan they had provided to the court was submitted in error and did not reflect their agreement. The district court entered the ultimate stipulated dissolution decree, described below, on July 18.

In the interim, Mann was arrested for stalking Harrison in violation of Neb. Rev. Stat. § 28-311.03 (Reissue 2016). The basis for that arrest, as described at Mann's subsequent plea hearing, was a series of acts by Mann between approximately May 29 and July 13, 2018, that included going through Harrison's trash, driving past her residence "multiple times," sending her "numerous text messages" professing his enduring love and asking her to save him and their family, and knocking on her door and when she did not answer, looking through the windows. Harrison "felt terrified and threatened by [Mann's] actions." To feel safe, Harrison purchased

cameras to record events outside her residence and stayed elsewhere. Then, on July 12, Mann yelled at Harrison from outside a locked swimming pool area where Harrison was with her daughters, making her "very nervous." Mann was taken into custody later that day. After his arrest, Mann called Harrison three times from jail. Mann "then made" several phone calls to his girlfriend wherein they discussed "ways to get back" at Harrison. Mann also "joked about meeting nice people in jail who offered to kill" Harrison.

## 2. Dissolution Decree

On July 18, 2018, less than a week after Mann's arrest, the district court entered a stipulated dissolution decree dissolving the parties' marriage. The decree granted Harrison and Mann joint legal and physical custody of the children, with Harrison generally having the final say on education, subject to limitations on changing the children's school district.

In addition, based on the parties' stipulation, the district court found that Mann stood in loco parentis to Maleah. The decree granted Harrison sole legal custody of Maleah, subject to limits on changing her school district. But Harrison and Mann were granted joint physical custody of Maleah.

The parties stipulated that Mann's income was $72,000 and that Harrison's was $30,000. Based on that, Mann was required to pay monthly child support of $294, decreasing to $226 for two children and $86 for one child as the children reached the age of majority. Mann was also required to maintain health insurance for the children so long as it was reasonably available to him through his employer.

Neither party appealed the decree.

## 3. Additional Factual Background

Harrison petitioned for a domestic abuse protection order on the same day the dissolution decree was entered. However, that petition was not served on Mann until December 14, 2018. Several weeks later, on January 4, 2019, Mann filed his own petition for a domestic abuse protection order. The

district court ultimately addressed both motions at once. The district court denied Mann a domestic abuse protection order but granted him a harassment protection order. In so doing, the district court referenced "incidents with the school lunches and [Harrison's] extended visits to [Mann's] home." According to the district court, those events showed that Harrison's contact with Mann served no legitimate purpose and could seriously intimidate him given that she "previously obtained a protection order against [him]." The district court similarly found that the lunch "incidents" and visits showed Harrison had willing contact with Mann and apparently was not in fear of imminent bodily harm. As a result, the district court denied Harrison's request for a protection order because her "conduct towards [Mann] belie[d] her allegations of abuse."

Meanwhile, on December 10, 2018, Mann pled guilty to stalking Harrison. Mann was sentenced to 2 years' probation, one condition of which was that he have no contact with Harrison.

## 4. Mann's Complaint for Modification and Harrison's Counterclaims

Mann subsequently filed an amended complaint to modify his child support obligations and the parenting plan. Mann alleged his income had "involuntarily decreased," while Harrison's income had increased "significant[ly]." Mann also alleged Harrison placed the children with third parties for "extended periods of time" when he was available to care for them and that she was routinely late in picking up the children, causing him to miss or be late for work or have to place the children with care providers. Mann requested "specific requirements related to" the children's transportation, the forfeiture of parenting time for unreasonable tardiness, and the reimbursement of any resultant childcare expenses. Mann also sought a "right of first refusal" to care for the children.

Harrison filed an answer generally denying Mann's claims and alleging two counterclaims. Harrison's first counterclaim sought to have the provisions of the dissolution decree regarding Maleah "declared void as a matter of law." Harrison alleged that when the decree was entered, the California judgment was in full force and effect and that the California court had never relinquished its exclusive, continuing jurisdiction over Maleah under the UCCJEA. As a result, Harrison alleged that the Nebraska court did not have jurisdiction over Maleah when the dissolution decree was entered.

Harrison's second counterclaim sought sole legal and physical custody of the children. Harrison claimed that since the entry of the decree, there had been a material change in circumstances in that Mann continued to "harass, stalk, and terrorize [her] by using the children as conduits for information" and "abuse[d] the [c]ourt system in order to have indirect contact with [her] and to cause her further emotional harm and distress." Harrison also pointed to Mann's stalking conviction and observed that a condition of his probation was that he have no contact with her. Harrison argued that stalking constituted domestic intimate partner abuse under the Parenting Act and that, as such, the district court was required to take specific actions to protect her and the children.

Harrison subsequently requested attorney fees.

### 5. Proceedings Prior to Modification Trial

There were multiple proceedings prior to the modification trial. However, for present purposes, we need note only that Harrison moved for summary judgment on her counterclaim regarding Maleah. The district court sustained that motion and vacated the portion of the dissolution decree finding that Mann stood in loco parentis to Maleah. The district court reasoned that insofar as it had no jurisdiction to modify the California judgment, it had no jurisdiction to make an initial custody determination as to Mann.

Mann filed an interlocutory appeal of the court's order. But we found that appellate jurisdiction over that appeal was lacking because the case involved multiple claims for relief and the partial summary judgment order did not resolve all such claims.[3]

### 6. Modification Trial and Order

The district court then held a trial regarding modification. Harrison and Mann were the sole witnesses. Harrison testified that Mann "terrifie[d] her" and that she "prefer[ed] not" to communicate directly with him, while deprecating the harassment protection order against her. Mann testified similarly that he "fe[lt] safer" not communicating directly with Harrison, while deprecating his conviction. The parties agreed that the children should no longer attend their current school. Otherwise, they disagreed as to where the children should go to school, the children's welfare, and the viability of communicating indirectly through their attorneys and exchanging the children at the residence of mutual friends or at school. Their specific testimony is discussed further below as it relates to the parties' arguments on appeal.

The district court subsequently entered an order of modification denying Harrison's request for sole custody of the children. The district court found that Harrison failed to show a material change in circumstances, occurring after the entry of the previous custody order and affecting the children's best interests, and that changing the children's custody was in their best interests. The district court reasoned that even though Mann was not convicted until December 2018, his "criminal charge" predated the entry of the dissolution decree, and that Harrison "was aware of the allegations" when she stipulated to joint custody. The district court also observed that the conduct in question occurred nearly 5 years ago, there was no evidence Mann engaged in stalking or harassment after the

---

[3] *Mann v. Mann*, 312 Neb. 275, 978 N.W.2d 606 (2022), *reversing* 29 Neb. App. 548, 956 N.W.2d 318 (2021).

decree was entered, and a harassment protection order was subsequently entered in his favor and against Harrison. The district court also found, "[f]or completeness," that even if there was a material change in circumstances, Harrison failed to establish that such change affected the children's best interests. The district court acknowledged that there was evidence the son had behavioral issues at school and the daughter was anxious. But the district court found "no evidence that these issues relate[d] to the present custody plan."

The district court also declined to adopt the changes to the parties' parenting time and their practices for exchanging the children that Harrison proposed as an alternative to sole custody, although the court made other changes to their parenting time.

In addition, the district court allowed Mann to enroll the children in the Elkhorn, Nebraska, or Bennington, Nebraska, school districts.

As to child support, the district court required Harrison to pay Mann monthly child support in the amount of $291 for two children, decreasing to $277 for one child as the children reached the age of majority, effective August 1, 2019. The child support calculations referenced in and attached to the court's order showed Mann's paying the health insurance premiums for the children.

The district court also preserved and incorporated its prior order vacating the portion of the dissolution decree that found Mann stood in loco parentis to Maleah.

### 7. Harrison's Motion to Alter

Harrison subsequently moved to alter the district court's order on the grounds that awarding Mann "retroactive child support" was inconsistent with the Nebraska Child Support Guidelines and the evidence that she did not begin earning her present wage until 2022. Harrison also argued that she should have been ordered to pay the children's health insurance premiums. After a hearing, the district court overruled Harrison's motion.

Harrison timely appealed, Mann cross-appealed, and we moved the matter to our docket.[4]

## III. ASSIGNMENTS OF ERROR

On appeal, Harrison assigns, restated and reordered, that the district court abused its discretion in (1) failing to find that Mann committed domestic intimate partner abuse; (2) failing to comply with the requirements of § 43-2932 and develop a parenting plan compliant with that statute; (3) modifying the holiday schedule to require exchanges that do not address § 43-2932's safety considerations; (4) placing the burden of proof to modify custody on her; (5) declining to award her sole legal and physical custody of the children or, alternatively, declining to make "less significant changes" to the parenting plan to protect her and the children; (6) giving Mann "legal custody over education" and allowing him to enroll the children in a school district not contemplated by the parties at the trial; (7) awarding Mann "retroactive child support" and ordering him to provide health insurance for the children; and (8) failing to award her attorney fees.

Mann's cross-appeal assigns, restated, that the district court erred by incorrectly interpreting the UCCJEA and determining that it did not have subject matter jurisdiction over Maleah.

## IV. STANDARD OF REVIEW

[1-3] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.[5] The award of attorney fees in an action for modification of a marital dissolution decree is reviewed under the same standard.[6] But when evidence is in conflict, the appellate

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[5] *State on behalf of Daphnie F. v. Christina C.*, 310 Neb. 638, 967 N.W.2d 690 (2021).

[6] See *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[7]

[4] Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.[8]

[5,6] The question whether jurisdiction should be exercised under the UCCJEA is entrusted to the discretion of the trial court and is reviewed by an appellate court de novo on the record for abuse of discretion.[9] In considering whether jurisdiction exists under the UCCJEA, a jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires an appellate court to reach a conclusion independent from the trial court.[10]

## V. ANALYSIS

### 1. Harrison's Appeal

#### (a) Harrison Had Burden of Proof Because Stalking Did Not Constitute Domestic Intimate Partner Abuse

[7] We begin with Harrison's arguments regarding § 43-2932 and the burden of proof as to her counterclaims for modification of the custody and related provisions of the dissolution decree, because our conclusions on those questions resolve many of her other arguments. Ordinarily, the party seeking modification of a dissolution decree has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification.[11] However, Harrison

---

[7] *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

[8] *Bohac v. Benes Service Co.*, 310 Neb. 722, 969 N.W.2d 103 (2022).

[9] *Hogan v. Hogan*, 308 Neb. 397, 954 N.W.2d 868 (2021).

[10] *Id*.

[11] *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021).

argues that the district court erred in applying the ordinary rule
to her counterclaims because Mann committed domestic inti-
mate partner abuse under the Parenting Act. As such, Harrison
argues that under § 43-2932(3), Mann had the burden of prov-
ing that legal or physical custody, parenting time, visitation,
or other access to him will not endanger her or the children.
Mann counters that his conviction cannot be considered or,
alternatively, does not constitute domestic intimate partner
abuse under the Parenting Act.

The Parenting Act establishes certain requirements for the
development of a parenting plan in cases where a parent is
found to have committed domestic intimate partner abuse or
other conduct that is not at issue in this appeal.[12] Specifically,
the Parenting Act requires that if a parent who would other-
wise be allocated custody, parenting time, visitation, or other
access to a child under a parenting plan committed domestic
intimate partner abuse, the court must impose "limits . . . that
are reasonably calculated" to protect the child or the child's
parent.[13] These limitations may include the allocation of sole
legal or physical custody to one parent and the exchange of
the child between parents in a protected setting,[14] as Harrison
proposed. The court may not order that legal or physical cus-
tody be given to a parent found to have committed domes-
tic intimate partner abuse without making "special written
findings" that the child and other parent can be adequately
protected by any limits imposed.[15] The Parenting Act also
prescribes that the parent found to have committed domestic
intimate partner abuse has the burden of proving that legal or

---

[12] *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019).

[13] § 43-2932(1)(a) and (b).

[14] § 43-2932(1)(b)(i) and (iii).

[15] § 43-2932(3). See, also, *Franklin M. v. Lauren C.*, 310 Neb. 927, 969
N.W.2d 882 (2022); *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d
578 (2015).

physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.[16]

The Parenting Act defines "[d]omestic intimate partner abuse" to mean "an act of abuse as defined in section 42-903 and a pattern or history of abuse evidenced by one or more" of several specified acts, which include stalking.[17] In turn, at all relevant times, Neb. Rev. Stat. § 42-903(1) (Supp. 2023) defined "[a]buse" to mean

the occurrence of one or more of the following acts between family or household members:

(a) Attempting to cause or intentionally and knowingly causing bodily injury[;]

(b) Placing, by means of credible threat, another person in fear of bodily injury[;] or

(c) Engaging in sexual contact or sexual penetration without consent[.]

For purposes of § 42-903(3), spouses and former spouses are family members.

In the present case, the parties advance various arguments as to whether Mann's conviction for stalking Harrison demonstrates domestic intimate partner abuse under the Parenting Act. Harrison claims "[t]here is no question that stalking is intimate partner abuse."[18] She bases this claim partly on the crime of stalking set forth in § 28-311.03, which encompasses willfully harassing another person or a family member of that person "with the intent to injure, terrify, threaten, or intimidate." Harrison also notes that stalking is among the acts specified in the Parenting Act's definition of "[d]omestic intimate partner abuse."[19] Mann, on the other hand, argues that his conviction was set aside. Alternatively, Mann argues that his conviction does not demonstrate domestic intimate partner

---

[16] § 43-2932(3).

[17] § 43-2922(8).

[18] Brief for appellant at 24.

[19] *Id*. See § 43-2922(8).

abuse because there was only "one instance of a stalking conviction," not a "pattern or history" of stalking, and there was no allegation he made a credible threat toward Harrison such that she reasonably feared bodily injury.[20] Harrison counters that "[s]talking by definition is a series of acts over a period of time which as a whole, constitute the crime of stalking."[21]

We need not address most of these arguments to resolve the matter.[22] Regardless of whether the Parenting Act is construed to require both an act of abuse and a pattern or history of abuse, or whether stalking is series of acts, we cannot agree with Harrison's argument that the crime of stalking under § 28-311.03 is inherently "[a]buse" as defined in § 42-903.

Under § 28-311.03, stalking involves willful harassment "with the intent to injure, terrify, threaten, or intimidate." "Abuse" under § 42-903, in contrast, involves, as relevant here, attempting to cause or intentionally and knowingly causing bodily injury or placing, by means of a credible threat, another person in fear of bodily injury. In other words, the crime of stalking set forth in § 28-311.03 can occur without the intent to injure, while "[a]buse," as defined in § 42-903, requires that bodily injury be caused, attempted, or credibly threatened, or other conduct not relevant here.

As such, we cannot rely solely on Mann's conviction for stalking to determine whether he committed domestic intimate partner abuse under the Parenting Act. Instead, we must look to the evidence presented to the district court regarding Mann's conduct to see if he attempted to injure Harrison bodily; intentionally and knowingly caused her bodily injury; or placed her, by means of a credible threat, in fear of bodily injury. Ultimately, we find that the evidence adduced does not show that Mann caused or intended to cause Harrison

---

[20] Brief for appellee at 12.

[21] Reply brief for appellant at 6.

[22] Cf. *State v. Reznicek*, 315 Neb. 272, 995 N.W.2d 204 (2023) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

bodily injury or placed her in fear of such injury. In reaching that conclusion, we are guided by our reasoning in *Blank v. Blank*.[23]

In *Blank*, an ex-wife appealed a dissolution decree awarding the parties joint physical custody of their minor children.[24] The ex-wife claimed this was an abuse of discretion in light of evidence that her ex-husband "'open hand smacked' [her] once during the parties' marriage and punched holes in the basement walls."[25] The ex-wife argued that the ex-husband's conduct was domestic intimate partner abuse under the Parenting Act.[26] We disagreed.[27] We reasoned that while "an 'open hand smack[]' may intend, cause, or place someone in fear of the requisite bodily injury, we [had] no evidence that such was the case here."[28] We observed that there was no testimony regarding the "severity, effect, or surrounding circumstances" on which we could rely to determine the intention or result of the action.[29] We also observed that there was no evidence of any injury and that the ex-wife never contended her ex-husband placed her in fear of bodily injury or in fear for her or the children's safety.[30] Nor was there any evidence of a pattern or history of similar actions.[31] As such, we concluded that without more, we could not say that the district court erred in determining the "'open hand[] smack'" was not domestic intimate partner abuse.[32]

---

[23] *Blank, supra* note 12.

[24] *Id.*

[25] *Id.* at 613, 930 N.W.2d at 532.

[26] *Id.*

[27] *Blank, supra* note 12.

[28] *Id.* at 616, 930 N.W.2d at 534.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

We reached the same conclusion as to the ex-husband's punching holes in the basement wall.[33] We observed that the evidence showed only that the ex-husband punched holes in the basement wall 2 to 3 years prior to the trial because he was "'really angry'" and that the children were in the house at the time, although they were not with him when he punched the wall.[34] There was no other testimony or evidence regarding

> when this occurred, the context of the argument, if anyone else was in the basement, how long after the argument took place [the ex-husband] punched the wall, whether [the ex-husband] had a history of similar acts, or any other information that would inform whether [the ex-husband] intentionally placed [the ex-wife] in fear of bodily injury.[35]

Like in *Blank*, the evidence of bodily injury or fear of bodily injury is lacking in this case. Both the record of Mann's plea hearing and Harrison's subsequent account of Mann's conduct at the modification trial described Mann's going through Harrison's trash; driving past her residence; texting her; knocking on her door and, when she did not answer, looking in her windows; and yelling at her from outside a locked swimming pool area. None of that implicates bodily injury, even if it did cause Harrison to feel "terrified and threatened" and to take certain actions to feel more secure. One can be fearful without fearing bodily injury, as the crime of stalking itself indicates with its requirement of an "intent to injure, terrify, threaten, or intimidate."[36] The word "or," when used properly, is disjunctive, and there is no indication

---

[33] *Id*.

[34] *Id*.

[35] *Id*. at 617, 930 N.W.2d at 534.

[36] See § 28-311.03. See, e.g., *In re Interest of Jeffrey K.*, 273 Neb. 239, 728 N.W.2d 606 (2007) (intent to intimidate).

that the statutory context overcomes the term's ordinary mean-
ing here. [37]

There was also Mann's conduct after his arrest, most nota-
bly the phone calls wherein he discussed ways to "get back"
at Harrison and "joked about meeting nice people in jail who
offered to kill [her]." Harrison apparently views this state-
ment as a serious "discuss[ion]" of "having [her] killed." [38]
However, Harrison's own exhibit describes the statement as
a "joke[]," and Harrison does not point to any evidence of
when she learned of this "joke[]" or how she felt when she
learned of it. Nor does Harrison cite any evidence that after
December 2018, Mann continued to engage in conduct like
that which led to his arrest. [39] Instead, her complaint for modi-
fication alleges only that Mann continued to "harass, stalk,
and terrorize [her] by using the children as conduits for infor-
mation and continue[d] to abuse the [c]ourt system in order to
have indirect contact with [her]."

[8] Our conclusion that the conduct underlying Mann's
conviction for stalking does not constitute domestic intimate
partner abuse should not be seen to depreciate the seriousness
of his conviction. Mann's argument that the conviction can-
not be considered because it was set aside was not supported
by the evidence. It was based on statements by his counsel at
the modification trial, and counsel's arguments are not evi-
dence. [40] Mann's testimony at the modification trial that the
only time in the proceedings when he lied was when he pled

---

[37] See, e.g., *Ash Grove Cement Co. v. Nebraska Dept. of Rev.*, 306 Neb. 947,
947 N.W.2d 731 (2020).

[38] Brief for appellant at 27.

[39] Compare, e.g., *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020)
(increase or escalation in parental instability or other behavior that affects
best interests of child); *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d
569 (2019) (similar).

[40] See, e.g., *In re Guardianship & Conservatorship of Alice H.*, 303 Neb.
235, 927 N.W.2d 787 (2019).

guilty to stalking is also troubling. However, the Legislature relied upon the definition of "[a]buse" in § 42-903 when defining "[d]omestic intimate partner abuse" in § 43-2922 of the Parenting Act, and "[a]buse" requires that bodily injury be attempted, caused, or credibly threatened or other conduct not at issue here. We are bound by the Legislature's choice of words. As we have stated, it is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.[41]

Accordingly, because there was no evidence Mann attempted to cause or intentionally and knowingly caused bodily injury to Harrison or placed her, by means of a credible threat, in fear of bodily injury, the district court cannot be said to have erred in failing to find that Mann committed domestic intimate partner abuse under the Parenting Act. And because Mann's conduct did not constitute domestic intimate partner abuse, the district court did not err in failing to comply with § 43-2932 and develop a parenting plan compliant with that statute, in not modifying the holiday schedule to incorporate § 43-2932's safety considerations, or in placing the burden of proof for purposes of modifying the custody and related provisions of the dissolution decree on Harrison.

### (b) Harrison Failed to Meet Burden of Proof as to Changes to Custody and Related Provisions of Decree

Harrison also essentially argues that the district court erred in finding that she failed to prove the occurrence of a material change in circumstances warranting that she be given sole legal and physical custody of the children or, alternatively, that the parenting plan be modified to minimize contact between her and Mann. Mann counters primarily that the evidence showed the children are doing well under the present custody arrangement.

---

[41] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

[9] Modifying a custody or parenting time order requires two steps of proof.[42] First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child.[43] Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests.[44]

[10] Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently.[45] As we have previously explained, "Proof of a material change of circumstances is the threshold inquiry in a proceeding on a complaint to modify, . . . because issues determined in the prior custody order are deemed res judicata in the absence of proof of new facts and circumstances . . . ."[46] Also, limiting modifications of custody and parenting time to those necessitated by a material change in circumstances "avoid[s] extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life."[47]

Harrison essentially argues that she met her burden of proof at both steps. Harrison argues that the district court's statement that Mann's "criminal charge" predated the dissolution decree and that she "was aware of the allegations" against him when she stipulated to joint custody was inconsistent with the evidence. In support of that argument, Harrison observes that "[t]here [was] nothing in the record that shows

---

[42] *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

[43] *Id*.

[44] *Id*.

[45] *Id*.

[46] *Eric H. v. Ashley H.*, 302 Neb. 786, 800, 925 N.W.2d 81, 92 (2019).

[47] *Lindblad, supra* note 42, 309 Neb. at 789, 962 N.W.2d at 555.

when [Mann] was charged . . . ."[48] Harrison also seemingly suggests that the phone calls wherein Mann discussed how to "get back" at her for his arrest and "joked about meeting nice people in jail who offered to kill [her]" were made after the entry of the dissolution decree. In addition, Harrison argues that Mann was not convicted of stalking until after the decree was entered. Harrison similarly argues that there was evidence of a "general lack of continuity [in] the children's health and education," arising from the lack of direct communication between her and Mann.[49] Harrison attributes this lack of communication to Mann's conviction and the terms of his probation.

Those arguments are without merit. Harrison is correct that there is nothing in the record on appeal to show when the criminal charge against Mann was filed. However, regardless of when that charge was filed, the bulk of the conduct for which Mann was convicted occurred on or about May 29 through July 13, 2018. The only acts that potentially took place after July 18 were the phone calls wherein Mann discussed how to "get back" at Harrison and "joked about meeting nice people in jail who offered to kill [her]." Based on the record before us, those calls could have been made either before the dissolution decree was entered or afterward, as Harrison suggests. However, as the party seeking modification, Harrison had the burden of introducing testimony or other evidence in support of a later date. She failed to do so.

As to the date of Mann's conviction, we decline to attribute the same weight to it that Harrison does, given the timing of events here. While the incident at the swimming pool and Mann's subsequent arrest had not yet occurred when the initial stipulated dissolution decree was entered, that decree was vacated, and the district court entered the ultimate decree on July 18, 2018. By that time, Mann had been arrested and

---

[48] Brief for appellant at 27.

[49] *Id*. at 19.

made his calls from jail to Harrison. Harrison nonetheless argues that although the parties knew of Mann's conduct and his arrest when the ultimate decree was entered, they did not "reasonably contemplate[]" his conviction at that time.[50] Harrison bases this argument on general concerns about the protections afforded to domestic abuse victims by the courts with which we are familiar. But the only example of the district court's alleged failure to protect Harrison that she cites is the fact that the district court denied her motion for a domestic abuse protection order and granted Mann a harassment protection order. However, that ruling was not made until months after the dissolution decree was entered.

Similarly, as to the best interests of the children, the evidence was less conclusive than Harrison claims. Harrison testified that because of the lack of direct communication between the parties, they did not share information about the children's health and education. However, Mann testified that the lack of direct communication between the parties was not an issue. Mann also testified that the children were happy and well behaved and did "pretty well" academically, thereby countering the claimed issues with the children that Harrison attributed to the lack of direct communication between her and Mann as a result of his stalking her. However, other evidence, including testimony by Harrison herself, ascribed the children's purported issues to their going back and forth between her and Mann's residences, and not the lack of direct communication between the parties.

The district court heard and observed the witnesses and impliedly credited Mann's account. Under the standard of review previously noted, we give weight to that determination.

Accordingly, because Harrison failed to show that a material change in circumstances occurred and that changing the children's custody or parenting time is in the children's best interests, the district court cannot be said to have abused its

---

[50] *Id*. at 33.

discretion in failing to award her sole legal and physical cus-
tody or, alternatively, amend the parenting plan to minimize
contact between her and Mann.

### (c) No Abuse of Discretion in Allowing Mann to Elect Between Two School Districts

Harrison's next assignment of error concerns giving Mann
the option to enroll the children in the Elkhorn or Bennington
school districts. Harrison claims this was tantamount to giv-
ing Mann sole legal custody over education. But, according
to Harrison, Mann's failure to plead sole legal custody "pre-
clude[s] the [district court] from awarding him sole legal
custody over any issue[]."[51] Harrison also argues that the
district court's order was not supported by the evidence and
that Mann was allowed to enroll the children in a school dis-
trict "never discussed or contemplated by the parties at the
time of trial."[52] Mann, in contrast, argues that the issue of
sole legal custody was raised by Harrison and litigated at the
trial. Mann also argues that there was evidence to support the
district court's decision.

To support her claim that Mann's failure to plead sole legal
custody precludes his being allowed to choose the children's
school district, Harrison points to our statement in *Heistand v.
Heistand*[53] that "the pleadings . . . frame the issues." However,
we do not understand this statement to mean that because
one party's pleadings do not request a specific modification,
the district court errs in granting such modification when
the other party's pleadings sought the modification and the
parties litigated the issue at the trial, as was the case here.
Harrison sought sole legal custody, including the right to
select the children's school, and the parties testified about
this matter at the modification hearing, as discussed below.
We find this to be sufficient. We have previously rejected

---

[51] *Id*. at 35.

[52] *Id*. at 36.

[53] *Heistand v. Heistand*, 267 Neb. 300, 313, 673 N.W.2d 541, 551 (2004).

challenges to modifications on due process grounds under similar circumstances.[54]

[11] Harrison also takes issue with the evidence underlying the district court's decision giving Mann the choice of the Elkhorn or Bennington school districts. However, under the standard of review previously noted and, in particular, given that the district court heard and observed the witnesses, we cannot say that the district court abused its discretion in allowing Mann to choose between the two school districts, even if one district was not discussed at the trial. A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[55] Those factors are not present here. There is evidence supporting the district court's decision to give Mann the choice of school districts due, in part, to Mann's work schedule.

Harrison and Mann both testified that they no longer lived in the Omaha, Nebraska, school district and no longer wanted the children to attend their current school. But they disagreed about which school the children should attend. Harrison testified in favor of the Millard Public Schools, where Maleah is enrolled. Harrison opined that her experience with Maleah's school had been "[a]mazing" and that it was "easy to communicate" with the teachers. Harrison also testified that she believed the children would benefit from being in the same schools as Maleah and that having children in different school districts was "chaotic" for her. As to her work schedule, Harrison testified that she worked 12-hour shifts as a traveling nurse and had a 2-hour commute each way to and from work. However, Harrison also testified that she was generally able to schedule her workdays for days when Mann had custody and that she tried to "remain very flexible" as to her work.

---

[54] Compare *Blank, supra* note 12, with *Eric H., supra* note 46.

[55] *State v. Anthony, ante* p. 308, 4 N.W.3d 393 (2024).

Harrison further stated that "being a nurse [gave] her . . . flexibility" and that she could move to alternate schedules.

Mann, in turn, testified that he moved to Elkhorn for the schools and was within walking distance of elementary, middle, and high schools. According to Mann, it would be "convenient" for him and the children if the children were enrolled there. Mann also testified that he could not move to the week-on-week-off parenting schedule proposed by Harrison because he opened the store where he worked in the mornings. Mann explained that opening the store conflicted with dropping the children off at school and that he could manage it a couple of days a week, but not for an entire week. However, after the trial and while the case was under advisement, Mann sent the district court a letter clarifying that due to a recent move, he had "inadvertently" moved to the Bennington school district. Harrison was copied on the letter, which expressly contemplated that the parties could address this information in their written summations to the court.

Accordingly, in light of this conflicting testimony, and given that Harrison had notice and an opportunity to be heard regarding the Bennington school district, we cannot say that the district court abused its discretion in allowing Mann to choose between the two school districts.

### (d) No Error as to Child Support or Health Insurance

Harrison also argues that the district court erred in ordering her to pay "retroactive child support" to Mann and in allowing Mann to pay the children's health insurance premiums.

### (i) Child Support

Unlike with the custody and related issues discussed above, Mann was the party who sought the modification of child support. As such, he had the burden of showing a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not

contemplated when the decree was entered.[56] Initially, in her answer to Mann's complaint, Harrison denied such a change. However, on appeal, Harrison does not appear to dispute that Mann lost his job or that her own income increased after the decree was entered. Nor does Harrison appear to dispute the requirement that she pay child support to Mann prospectively. Instead, Harrison objects to being ordered to pay child support retroactively to August 1, 2019. Harrison argues that this is contrary to the evidence that she "only began out-earning [Mann] in 2022"[57] and effectively rewards Mann for delaying the proceedings. Mann counters that the award was appropriate because he "overp[aid] [Harrison] based on an income which he no longer possessed due to the loss of his job."[58]

[12,13] Whether a child support order should be retroactive is entrusted to the discretion of the trial court, and an appellate court will affirm its decision absent an abuse of discretion.[59] Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification.[60] We have explained that the reason for this rule is that in a modification of child support proceeding, the child and custodial parent should not be penalized, if it can be avoided, by the delay inherent in our legal system.[61]

Under the standard of review previously noted, we cannot say that the district court abused its discretion in requiring Harrison to pay child support retroactively to August 1, 2019, the first day of the month after Mann's amended complaint was filed. The record shows that Mann's income fell from $72,000 in 2018 to $19,419 in 2019 because he lost his job.

---

[56] *Tilson, supra* note 6.

[57] Brief for appellant at 37.

[58] Brief for appellee at 19.

[59] *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015).

[60] *Id.*

[61] See *id.*

There is no evidence of Harrison's income in 2019. Nor is there any evidence as to why Harrison's income of $19,000 in 2020 was less than her stipulated income of $30,000 in 2018.[62] Harrison testified to passing her nursing boards in fall 2020. However, beyond this brief mention of boards, there was no evidence regarding Harrison's employment or education in 2019.

We take a similar view of Harrison's claim that the award of "retroactive child support" was inappropriate because "there was no evidence [she] has any ability to pay a lump-sum order"[63] and her payment of retroactive child support would negatively affect her ability to provide for the children. Nebraska courts have previously held that in the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations.[64] However, there was no such evidence here. Harrison produced no evidence of any debts and obligations other than her support of Maleah.

As to Harrison's claim that awarding Mann retroactive child support effectively allows him to benefit from the delay he caused by filing the interlocutory appeal, there is nothing to suggest the delay here was anything other than the standard delay associated with the judicial process.[65]

### (ii) Health Insurance

Harrison also claims that the district court erred in allowing Mann to claim the children on his health insurance because

---

[62] See, e.g., *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013) (no error in increasing father's child support obligation, despite his enrollment in educational program, where evidence showed that father changed career and educational paths without consideration of child's needs).

[63] Brief for appellant at 38.

[64] See *Freeman, supra* note 62.

[65] See, e.g., *Johnson, supra* note 59.

he did not provide a breakdown of the respective costs for him and the children, while she did. Mann disagrees.

We again cannot say that the district court abused its discretion. Mann's proposed child support calculation, which was admitted into evidence, gave health insurance premiums for him and the children. In contrast, Harrison's proposed child support calculation, which was also admitted into evidence, showed premiums for her and Mann, but not for the children. Harrison also points to another exhibit, outlining her employee benefits. But there was sufficient evidence upon which the district court could have based its decision.

### (e) Harrison Was Not Entitled to Attorney Fees

Finally, Harrison argues that the district court erred in not awarding her attorney fees. Harrison claims that over the 4 years this case was pending, she "attempted to work with [Mann] through his attorney to avoid conflict," but was involved in multiple legal proceedings as a result of "[Mann's] actions."[66] In particular, Harrison claims Mann's conviction for stalking was the "catalyst" for her request to modify the dissolution decree.[67] As a result, Harrison claims she should receive attorney fees. Mann counters that Harrison is not entitled to attorney fees under Nebraska law.

[14,15] Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.[68] We have previously recognized that the trial court has the ability to award fees in modification proceedings.[69] However, customarily, attorney

---

[66] Brief for appellant at 39.

[67] *Id.*

[68] See, e.g., *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024); *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

[69] See, *Tilson, supra* note 6; *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

fees are awarded only to prevailing parties or assessed against those who file frivolous suits.[70]

Here, Harrison does not assert she was the prevailing party. Nor does she argue on appeal that Mann's suit was frivolous, although her initial complaint could be construed to suggest he had an improper motive insofar as he allegedly "abuse[d] the [c]ourt system in order to have indirect contact with [her] and to cause her further emotional harm and distress."[71] Instead, Harrison focuses on the costs she claims Mann caused her to incur. But Harrison cites no authority to support her claim that Mann's purported responsibility for her costs entitled her to attorney fees even though she does not claim to be the prevailing party or that Mann's suit was frivolous.[72] As such, the district court cannot be said to have abused its discretion in declining to award Harison attorney fees.

## 2. MANN's CROSS-APPEAL

In Mann's cross-appeal, he challenges the district court order vacating the portion of the dissolution decree that found he stood in loco parentis to Maleah. Mann argues that the district court misconstrued the UCCJEA when it concluded that it lacked subject matter jurisdiction over Maleah. Harrison, in turn, argues that the matter is moot because in loco parentis status is transitory and Mann has not had any contact with Maleah since 2019. Alternatively, Harrison argues that the district court properly found it lacked jurisdiction over Maleah under the UCCJEA because the California court that

---

[70] *Garza, supra* note 69; *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001).

[71] *SID No. 596, supra* note 68 (when used in reference to attorney fees, term "frivolous" connotes improper motive or legal position so wholly without merit as to be ridiculous).

[72] See, e.g., *Bowmaker v. Rollman*, 29 Neb. App. 742, 764, 959 N.W.2d 819, 836 (2021) (rejecting ex-wife's claim that district court abused its discretion in not awarding her attorney fees because ex-husband allegedly "'treated [her] unfairly and inequitably during the proceedings'").

made the initial custody determination as to her never relinquished jurisdiction. We agree with Harrison that the district court properly found it lacked jurisdiction.

Previously, in *DeLima v. Tsevi*,[73] we distinguished between "jurisdiction generally" and "jurisdiction . . . over a specific child custody proceeding under the UCCJEA" when rejecting an ex-husband's challenge to a district court order vacating all prior orders concerning the custody of the parties' child. This included the order that awarded him "sole care, custody, and control" of the child.[74] On appeal of that order, we affirmed the district court's ruling.[75] We reasoned that "while other statutes may confer jurisdiction generally," Neb. Rev. Stat. § 42-351 (Reissue 2016) "directs courts to determine whether jurisdiction exists over a specific child custody proceeding under the UCCJEA."[76] Then, after reviewing the relevant provisions of the UCCJEA, we concluded that such jurisdiction over that specific child custody proceeding was lacking because under § 43-1238 of the UCCJEA, a court in the foreign country in which the child lived would have had jurisdiction.[77]

We find *DeLima* and, in particular, its distinction between "jurisdiction generally" and "jurisdiction . . . over a specific child custody proceeding under the UCCJEA" to be dispositive here.[78] Mann's arguments regarding the Nebraska Constitution and the district courts' equity jurisdiction—arguments that he claims ultimately lead to the conclusion that Harrison lost her opportunity to challenge the provisions of the dissolution decree regarding Maleah when she failed to file a

---

[73] *DeLima v. Tsevi*, 301 Neb. 933, 937, 921 N.W.2d 89, 93 (2018).

[74] *Id*. at 935, 921 N.W.2d at 92.

[75] See *DeLima, supra* note 73.

[76] *Id*. at 937, 921 N.W.2d at 93.

[77] See *DeLima, supra* note 73.

[78] *Id*. at 937, 921 N.W.2d at 93.

direct appeal—concern jurisdiction generally.[79] They do not go to the question of "jurisdiction . . . over a specific child custody proceeding" per *DeLima*.[80] To determine that, we instead look to the UCCJEA, which we have previously found does not improperly encroach upon the inherent powers granted to the district courts by the Nebraska Constitution.[81]

No one disputes that Maleah was the subject of a child custody determination made by a California court. As such, the relevant section of the UCCJEA is § 43-1240. Captioned "[j]urisdiction to modify determination," that section prohibits courts of this state from modifying child custody determinations made by courts of other states unless a court of this state has jurisdiction to make an initial child custody determination under specified provisions of § 43-1238 and one of the following conditions are met:

> (1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under section 43-1239 or that a court of this state would be a more convenient forum under section 43-1244; or
>
> (2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.[82]

The provisions of §§ 43-1238, 43-1239, and 43-1244 referenced here set forth additional requirements regarding initial child custody jurisdiction; exclusive, continuing jurisdiction; and inconvenient forum, respectively. However, we need not consider them further here because no one alleges that any court made any of the requisite determinations under

---

[79] See, e.g., *Susan L. v. Steven L.*, 273 Neb. 24, 729 N.W.2d 35 (2007) (as used in provisions of Nebraska Constitution regarding jurisdiction of district courts, term "jurisdiction" broadly denotes concept of legal power to interpret and administer law in premises).

[80] See *DeLima, supra* note 73, 301 Neb. at 937, 921 N.W.2d at 93.

[81] See, e.g., *Susan L., supra* note 79.

[82] § 43-1240.

§ 43-1240. Specifically, no one alleges that the California court determined it no longer had exclusive, continuing jurisdiction or that Nebraska would be a more convenient forum. Nor does anyone allege that the California court or a Nebraska court made any determination about the residence of Maleah or that of her parents or any person acting as her guardian.

[16] Insofar as the district court lacked jurisdiction under the UCCJEA to modify the California child custody judgment as to Maleah, it cannot be said to have erred in voiding the provisions of the dissolution decree that found Mann stood in loco parentis as to Maleah, even though Harrison did not raise the issue on direct appeal. Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties.[83]

## VI. CONCLUSION

For the reasons set forth above, the district court did not abuse its discretion in declining to make the modifications to the dissolution decree proposed by Harrison or in its handling of the children's school, child support, health insurance, or attorney fees. Nor did the district court err in vacating the portion of the dissolution decree that found Mann stood in loco parentis to Maleah. Accordingly, we affirm the order of the district court.

Affirmed.

---

[83] *Hogan, supra* note 9.

Miller-Lerman, J., concurring.

Harrison claims that Mann's conduct of stalking of which he was convicted amounts to "domestic intimate partner abuse" under the Parenting Act, thus triggering the protective requirements of Neb. Rev. Stat. § 43-2932(3) (Reissue 2016). The majority opinion accurately states:

However, [in § 43-2922(8)] the Legislature relied upon the definition of "[a]buse" in § 42-903 when defining "[d]omestic intimate partner abuse" in § 43-2922 of the Parenting Act, and "[a]buse" [in § 42-903] requires that bodily injury be attempted, caused, or credibly threatened or other conduct not at issue here. We are bound by the Legislature's choice of words.

Accordingly, I concur with the conclusion that Mann's conduct did not constitute statutory domestic abuse under the Parenting Act. In Nebraska, domestic abuse under the Parenting Act is associated only with bodily harm.

I believe our conclusion is not the equivalent of saying there is an absence of domestic abuse in the picture that operates at the psychological level and, in addition to the impact on the parent, exposes the children to risks, including the "'risk of brain damage.'" See Lynn Hecht Schafran, *Domestic Violence, Developing Brains, and the Lifespan New Knowledge from Neuroscience*, 53 No. 3 Judges' J. 32, 35 (Summer 2014). A court of appeals in California recently remarked on the seriousness of stalking in particular and stated as follows:

Stalking is "strongly associated with physical violence"; men who stalk their partners after a break-up are four times more likely to assault them. (Lo, *A Domestic Violence Dystopia: Abuse via the Internet of Things and Remedies under Current Law* (2021) 109 Cal. L. Rev. 277, 282.) But stalking and other controlling behaviors are more than just useful predictors of future physical harm. They cause significant psychological damage on their own[.]

*G.G. v. G.S.*, No. B331994, 2024 WL 2720300 at *6 (Cal. App. May 28, 2024).

According to statute, § 43-2932(1)(b) protections are "calculated to protect the child or child's parent from harm." Nebraska's Parenting Act protections are not comprehensive. Elsewhere, the courts are not precluded by the Legislature from treating stalking as domestic abuse in matters of custody.

For example, the Oklahoma statute addressing the issue provides as follows:

> In every case involving the custody of, guardianship of or visitation with a child, the court shall consider evidence of domestic abuse, stalking and/or harassing behavior properly brought before it. If the occurrence of domestic abuse, stalking or harassing behavior is established by a preponderance of the evidence, there shall be a rebuttable presumption that it is not in the best interest of the child to have custody, guardianship, or unsupervised visitation granted to the person against whom domestic abuse, stalking or harassing behavior has been established.

Okla. Stat. Ann. tit. 43, § 109.3 (West 2016).

However, because the Nebraska Legislature has limited domestic abuse in the Parenting Act to acts associated with bodily harm and not provided that stalking triggers § 43-2932's safety considerations, I concur in the majority opinion of this court.